STANDARD ASPHALT & RUBBER CO. v. AMERICAN ASPHALTUM & RUBBER CO. et al.

(District Court, N. D. Illinois. February 24, 1913.)

No. 29,015.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—ASPHALTIC FLUXES.

The Culmer & Culmer patents, No. 635,429, for a process of making asphaltic fluxes by dehydrating petroleum residuum and simultaneously passing an air blast through the charge, and No. 635,430, for the product of such process, were not anticipated by the Byerley patent, No. 524,130, and must be conceded patentable novelty and invention, in view of the presumption arising from the grant, the large use of the product in pavement construction, and the difference between the two products, especially when considered in connection with the paving art; also *held* infringed.

2. PATENTS (§ 250*) — ANTICIPATION — CHEMICAL PROCESSES — IDENTITY OF PRODUCTS.

In comparing chemical processes, the lack of identity in the products is evidence of lack of identity in the processes.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 390, 392, 393; Dec. Dig. § 250.*]

In Equity. Suit by the Standard Asphalt & Rubber Company against the American Asphaltum & Rubber Company, James F. Hill, and Henry Rawstron. On final hearing. Decree for complainant.

Offield, Towle, Graves & Offield and Frank L. Belknap, all of Chicago, Ill. (Charles K. Offield and Albert H. Graves, both of Chicago, Ill., of counsel), for complainant.

Edward Rector and Charles C. Bulkley, both of Chicago, Ill., for defendants.

KOHLSAAT, Circuit Judge. [1] Complainant files its two bills to restrain infringement of process patent No. 635,429 and product patent No. 635,430, both granted October 24, 1899, to George F. and George C. K. Culmer, being, respectively, for the process of making, and product, of asphaltic fluxes. The claims read as follows:

"The method of preparing asphaltic fluxes which consists in dehydrating petroleum residuum, holding the mass in heated state sufficient to drive off water, but below the pitch-forming temperature—e. g., below 550° Fahrenheit—and simultaneously blasting the charge with air so as to profoundly modify the characteristics thereof, thus markedly lessening the petrolene content and markedly increasing the asphaltene content, without material loss through destructive distillation, while the volume and specific gravity of the finished batch remain essentially the same as in the dehydrated residuum, substantially as described."

"A black semi-solid asphaltic flux devoid of pitch, the same consisting of dehydrated and oxidized petroleum residuum, nearly alike in volume and specific gravity with the original residuum, but markedly higher in its content of asphaltene and lower in its petrolene than the residuum from which it was derived, and possessing the characteristics of a product obtained by prolonged exposure of petroleum residuum to a heat below pitch-forming temperature—e. g., below 550° Fahrenheit—under copious injection of air to transform the mass without material distillation, substantially as described."

The main value of the product obtained consists in providing a flux to be used in connection with Gilsonite, a mineral asphalt, in the construction of asphalt pavements. Prior to the alleged discovery of the flux in question, it is claimed that such fluxing was so imperfectly accomplished as to be impractical in the pavement art. Residuums of petroleum oil were used, but resulted in a roadbed that would soften and expand with hot weather and crack with cold. Complainant asserts that its product fluxes with asphalt, including Gilsonite, in such a manner as to make a roadway which practically overcomes this difficulty.

The process, briefly stated, consists in treating a given body of petroleum residuum, which has resulted, after the elimination of various light oils, under applications of heat ranging up to 650° or 700°, to heat approximating 380° in temperature, and at the same time permeating and agitating the mass by the violent injection of air. The body to be treated is first heated for a period of about 8 hours, until it is practically dehydrated. The air is then forced in from underneath the mass. The temperature is maintained at practically 380°, and the air applied for approximately 32 hours, when the amount of air may be reduced for a further period of 8 hours. During the 32-hour period, the mass thickens. The heat may be decreased, either by the reduction of air applied or by checking the fire. Previous to the introduction of the air, the batch is reduced in weight, approximately, 5 per cent.—not from any chemical action, but from dehydration. At the close of the 40-hour period, the loss does not exceed from 3 to 4 per cent. This the patentee accounts for by claiming the fixation of oxygen derived from the air blast, while petroleum residuum will not distill at a temperature less than that under which it was produced. The patentee claims that a marked change occurs in the mass under the air blast treatment. This is shown in the increase in the percentage of asphaltene therein after the 40-hour treatment with air. The real chemical and other effects of such processes are not definitely known, so that much is left to speculation. The time required may be varied with the character of the treatment, viz.:

"Holding the temperature beyond 380° Fahrenheit a harder flux will be produced, and below such temperature a softer. Hence, at the higher range, the air blast need be used for less time to afford a standard yield. At the lower range the blast must persist longer, or again at the lower range, for example, by increasing the volume of air supply, the period of treatment is lessened. Doubling the blast may nearly halve the time."

The character of the residuums treated is also a factor. By using the product of the patents in suit, it is claimed that the question of a successful pavement is solved.

Complainant claims to have built up a trade of 3,000,000 pounds per annum, so that the question presented is a very serious one. The cost of asphalt considerably exceeds that of the flux here involved. Prior to the present invention, it is claimed, the flux used could not exceed 25 per cent. of the pavement body. Under the instant process, it may be used up to 75 per cent. or 80 per cent. thereof.

Defendant sets up, by way of defense, several matters, of which it is only deemed necessary to consider two: First, patent No. 524,130,

for manufacture of asphalt and other products from petroleum, granted to F. V. Byerley, August 7, 1895, by way of showing invalidity of the two patents in suit; second, prior use and prior publication by the Byerleys.

The patent to Byerley declares:

"This invention related more particularly to the manufacture of solid bodies from petroleum, but each of the improvements constituting the same is included for all the uses to which it may be adapted."

This patentee calls attention to the methods of treatment of petroleum residuum, whereby he says the residuum has been reduced to coke or coke containing pitch. He distills the residuum to a solid body by a prolonged exposure to "a pitch-forming, non-coking temperature, about 600° F., with agitation and exposure to air or gas, which product is soluble in benzine 62° Baume. These bodies he calls new. He says:

"They vary, according to the extent to which the process is pushed, in hardness at atmospheric temperatures (say at 60° F.) from a rubberlike consistency to a mass of hardness and conchoidal fracture like the natural asphaltum."

The mass freed from oil, he says, is adapted to making varnish, and may be used in paving and roofing. He states that, in mixing for pavement purposes, the product should be used with oil. He claims that, while oils taken from different localities differ in specific gravity, his process can be used on residuums from any or all of them. He sets out the advantages of the application of air at atmospheric pressure to the residuum, and says:

"The distillation and formation of the asphalt may thus take place at a lower temperature, which favors the desired changes in the tar."

He recommends the application of the air blast or admixture in distilling other coal oil substances.

"So far as I am aware," he says, "it is new generally to subject a natural or artificial tar or pitch-forming oil to a pitch-forming, non-coking, or indeed to a pitch-forming temperature, whether accompanied by more or less coking or not, with agitation and exposure to air," etc. "Distillation of the flux," he continues, "should be carried on under a temperature of 600° F., and with some oils it may be produced at even 700° F., though the lower temperature is preferred in the use of Lima tar. Coking," he asserts, "must be avoided. If Lima tar of a heavier gravity is to be treated, the distillation commences at a higher temperature, and the entire operation is ended sooner."

The claims cover the process of making asphaltic products by prolonged exposure of petroleum tar to pitch-forming, non-coking temperature in a still, with agitation and exposure to air; also the—

"new asphaltic petroleum products soluble in benzine, varying in hardness at atmospheric temperatures from a rubberlike consistency to a mass of a hardness and conchoidal fracture like the natural asphaltums, the less hard having also a conchoidal fracture at lower temperatures, melting at from about 200° Fahrenheit to about 400° Fahrenheit, according to hardness," etc.

It will be seen that Byerley used a practically closed still in his process. It is complainant's contention that in practice Byerley's mass suffered a substantial decrease in weight, due to distillation, while Culmers' loss was very slight. On this point the evidence is very con-

tradictory. The experiments conducted at Whiting, Grand Crossing, Ill., and at Independence, Iowa, are not satisfactory. They were ex parte and irreconcilable, and cannot be held to settle the question. The same may be said of the expert testimony. There is much learned discussion bearing upon the character of the changes, if any, which take place during the application of heat and air to petroleum residuum.

Complainant contends that through use of the still consequent distillation takes place in Byerley's process, whereby hydrogen is split off from the mass, which combines with the oxygen of the air to form water and further distillation, while in some occult manner the oxygen supplied by the Culmer process, being applied by force and not by suction, as in Byerley's, becomes fixed in the mass in such a manner as to offset in weight the loss sustained by dehydration in the first stages of the process. It is conceded that, by the application of heat at about 380° F. the so-called petrolene of the mass gives way to a considerable degree to the so-called asphaltene, and the liquid residuum thickens up, so that the melting point is advanced, whereby it may be used in paving in connection with Gilsonite or national asphaltum, without fear of its becoming too soft under heat or too hard and liable to crack in cold weather. This unsusceptibility to climatic changes is one of the chief results, and is claimed by both patentees.

Byerley, in his circular of 1895, in evidence as "Exhibit Byerley Circular," lays great stress upon the indestructibility of his product. The issues are befogged somewhat by the indiscriminate use of the terms distillation, coke, and pitch; the two patentees seemingly having somewhat different ideas in mind in the use of the terms. It has been the purpose of the court to make reasonable allowance for these discrepancies. It is defendants' contention that the splitting off of hydrogen from the hydrocarbons of the residuum effects the change from petrolene to asphaltene, that this occurs at and above a temperature of 550° F., and that the difference between its four exhibits and the product of the patent is simply one of degree. Defendant further contends that Byerley's product dissolves in carbon bisulphide, except as to a portion less than 2 per cent. thereof, and the product must have been effected at a temperature which Byerley calls "a pitch-forming, but non-coking, temperature, and which Culmer describes as below a pitch-forming temperature. Culmers place their temperature at about 380° F., deeming that the point at which they may be safe from the formation of what they call "pitch," but which Byerley calls "coke." The test of the desired product, defendant insists, is that it shall dissolve in carbon bisulphide.

It appears from the evidence that the Culmers were quite familiar with the Byerley patent process and product when they filed their application for the patent in suit, and, so far as the record shows, were thereby advised of the desirability of a process involving the combined action of heat and an air blast upon the petroleum residuum. With this information at hand, they set out to devise a flux for refined Trinidad and other materials suitable for paving purposes. In doing this, they sought for a flux which should be immune to climatic changes, and one which would, while acting as a flux to asphaltum, be itself in considerable degree a substitute for natural asphaltum and

Gilsonite. Byerley, while not in terms claiming a hardened flux or a substitute for asphaltum, seems to have so claimed in effect. His specimen No. 1 was the result of from 500° to 600° F. heat and applied air; No. 2 was the product of air and from 400° to 450° F. heat. Both Nos. 1 and 2 received an air blast covering four days, and may be used in making varnish and pavement, the patent says. No. 3 was treated about the same as No. 2, and was intended for paving and varnish. No. 4 was subjected to air and heat at about 300° F., and was intended as a flux for other asphalts. It thus appears that Byerley's process covered a range of temperature, including 380°, together with a natural air pressure application. It is true the process took approximately 4 days, whereas Culmers' took about 40 hours. But it seems to be conceded that Culmers' increased application of air would have the effect of reducing the duration of the process.

Complainant accounts in part for what it insists is the difference between Culmer and Byerley by reference to the employment of its open kettle as against Byerley's closed still, whereby the mass is freed from the condensed distillation which would attend the use of a still. It is not clear that such is the case, though it would appear that in the case of the use of a closed kettle the mass would be more exposed to the cracking off of hydrogen and hydrocarbon, and consequent increase of moisture through union with the oxygen of the applied air. However, the evidence as to the process leaves the court in doubt as to whether the increased oxygen of Culmer over Byerley, if any, results in considerable part from this cause. Byerley did not elaborate his process for a pavement flux, as Culmer did. He was absorbed in his new idea, so far as the record shows, of the results to be obtained from blowing the petroleum residuum into a substance which should, while losing none of its fluxing properties, be of such a consistency that it could be used in connection with asphaltic and other substances in forming solid bodies which would be unresponsive to climatic changes. This is clearly set out in his circular above referred to. The only substantial evidence offered in support of the claim that he succeeded in his quest as to a pavement material is found in the statement of several witnesses to the effect that 40,000 yards of pavement prepared in accordance with the suggestion of the Byerley patent were laid in Cleveland and Marion, Ohio, in 1894 and 1895, which were still in good condition at the time the evidence was taken. Strange to say, Culmer furnished the stone for the laying of this pavement. No specimen of the pavement is shown, and to that extent the evidence is weakened. It does not appear that Byerley ever made any considerable application of his process to the paving trade. It has now become public, and defendant claims to be operating under it.

When the Culmers received their patent, Byerley's patent was 5 years old. It does not, however, appear from this record that defendant has manufactured any considerable amount of the product in suit, while complainant is manufacturing more than 5,000,000 pounds a year. Byerley failed during the life of his patent, and for 12 years after the Culmers took out their patent, to institute any proceedings to hold the Culmers for infringement. The evidence of infringement by

defendant of Culmers' patent is covered by stipulation, which reads as follows, viz.:

"It is admitted by the defendant corporation, American Asphaltum & Rubber Company, that prior to the commencement of this suit and in the Northern district of Illinois it has treated the residuum oil of petroleum by subjecting the oil to a constantly maintained temperature of between 300 and 500 degrees; that temperature varying within this range, depending upon the particular character of such oil treated, and blowing the oil with air for a period of from 30 to 45 hours. And the defendant agrees to produce a specimen of the product from such treatment."

While there is confusion as to the fact of the identity of the Culmers' process with that of Byerley, the evidence seems to be clear as to the lack of identity between the product of the process patent in suit and that of Byerley.

The exhibits introduced by defendant are hard and friable in the harder varieties, and break with what the experts call conchoidal fracture. The softer specimens are cheesy, and all of them are wanting in the cementitious and rubbery character of Culmers' product. They are described as rotten and crumbling by complainant's expert. This is the result, the expert says, of high temperature or overheated material. He further says it was impossible to effect a perfectly homogeneous admixture without increase of temperature, while Culmers' blown residuum would flux Gilsonite without application of heat, by manual manipulation. Byerley's product seemed porous, while Culmers' resembled an amber-colored jelly under the microscope. Complainant's expert witness was able manually to incorporate Gilsonite powder into an equal weight of Culmers' product without heat, whereas this could not be done with Byerley's product, even with application of 212° F.

Culmers' product is a homogeneous mass. This cannot be said of the Byerley samples in evidence—especially as to the softer specimens. Whatever they may have been when first introduced (as to which the evidence is not satisfactory), they are at the present time inferior for paving purposes to those of the Culmers.

[2] Under the evidence, it is not shown that these differences are traceable to the difference in quality and specific gravity of the oil residuum treated. Added to these is the presumption arising from the grant of the patent. The foregoing are deemed sufficient to show that the two products are different, and, when considered in connection with the paving art, radically different. In Pickhardt v. Packard (C. C.) 22 Fed. 530, Judge Wallace held that the identity of a process might be inferred from chemical identity. Now, there is no doubt as to what Culmers' process was, nor of the resultant product. In chemical processes, the converse of the Pickhardt Case would seem necessarily to be true; i. e., that a lack of identity between the two products argues a lack of identity in the processes.

In view of the great extent to which the Culmer products have been used in pavement construction, the obstacles overcome in securing a suitable ingredient for pavement construction, and the presumption arising, as above stated, from the grant of the patents in suit, they are held to be valid and infringed.